IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 6, 2016

**STATE OF TENNESSEE v. CHRISTOPHER BOSTICK**

**Appeal from the Criminal Court for Shelby County**
**No. 13-02706    James C. Beasley, Jr., Judge**

_____

**No.  W2016-00573-CCA-R3-CD**
_____

The Defendant, Christopher Bostick, was found guilty by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony. *See* T.C.A. §§ 39-15-522 (2014), 39-13-504 (2014).  The trial court sentenced the Defendant to consecutive terms of twenty-five years for rape of a child and nine years for aggravated sexual battery, for an effective sentence of thirty-four years at 100% service.  On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred by limiting his cross-examination of the victim's sister and the forensic interviewer.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Stephen C. Bush, District Public Defender; and Tony N. Brayton (on appeal), Greg Carman (at trial), and James Coleman (at trial), Assistant District Public Defenders, for the appellant, Christopher Bostick.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Amy P. Weirich, District Attorney General; and Jessica Banti and Lessie Rainey, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In this case, the Defendant was indicted for rape of a child and aggravated sexual battery. The victim, B.T.,[1] was age seven at the time of the incidents, and the Defendant met the victim and his family through a mentoring program.

The victim's mother testified that she and her husband had three children, B.T., a son, M.T., who was B.T.'s twin sister, and I.T., who was B.T. and M.T.'s younger sister, and that she and her husband were foster parents to the children before they adopted them. The victim's mother said that in the fall of 2010, B.T. and M.T were age six and that she contacted the mentoring program to obtain mentors for the children. The victim's mother said that she and her husband were older parents and that she wanted their children to have additional role models. She said that the Defendant was B.T.'s mentor, that the Defendant and B.T. spent their time together at the family home for the first year because she was an over-protective mother, and that the Defendant helped B.T. with homework and provided general childcare for B.T. She said she began to think of the Defendant as another son, that she trusted the Defendant with her children, and that the Defendant sometimes stayed overnight at her home.

The victim's mother testified that in December 2012, she received a telephone call informing her of her aunt's death when the family and the Defendant were at a movie theater. She said that the Defendant stayed overnight at her home, that the Defendant, B.T., and the victim's cousin slept in B.T.'s bedroom, and that the bedroom had bunk beds and a third mattress. The victim's mother said she had never seen the Defendant mistreat her children.

The victim's mother testified that in late 2012, she began noticing a change in B.T.'s behavior and that B.T. began getting in trouble. She recalled B.T.'s asking if he could have a new mentor and said she asked B.T. why he wanted a new mentor, although B.T. did not respond. She recalled times when the Defendant was alone with B.T. and other times when the Defendant was alone with B.T. and M.T. The victim's mother said that on October 15, 2012, she was at Walmart when she noticed a bleeding scratch on B.T.'s chin. She said that she asked B.T. about the scratch and that B.T. said the Defendant caused the scratch and reported the Defendant was "always touching [him] in a sexual manner." The victim's mother and her husband did not believe the accusation, but M.T. told the victim's mother that B.T. was being truthful.

The victim's mother testified that initially she did not want to hear any details from B.T., that she called the Defendant, that the Defendant denied any wrongdoing, that after the conversation, she took B.T. to the hospital for an examination, and that hospital staff contacted the police. She said that after the examination, B.T. and M.T. participated in forensic interviews at the Child Advocacy Center. She denied talking to B.T. and M.T.

---

[1] It is this court's policy to refer to minors and victims of sexual assault by their initials.

about what occurred with the Defendant and said B.T. did not want to talk to his mother about it.

On cross-examination, the victim's mother testified that she met the Defendant in September 2010, and that the Defendant had been B.T.'s mentor for about two-and-one-half years when B.T. disclosed inappropriate touching. She agreed it was about one-and-one-half years before she allowed the Defendant and B.T. to be alone. She agreed the Defendant took B.T. to a professional basketball game and to the Defendant's grandparents' church. She thought she first allowed the Defendant to stay overnight at her home in 2012. She said that the scratch on B.T's chin looked similar to a fingernail scratch and that it looked as though B.T. had "picked at a scab" when she saw it bleeding.

The victim's mother testified that B.T. ultimately reported an incident occurred when his sisters were at majorette practice and that majorette practice was on Mondays, Wednesdays, and Fridays during the summer of 2012. The victim's mother noted, though, that M.T. joined B.T.'s karate class about three weeks after majorette practice began. The victim's mother said that B.T. reported more than one incident but did not tell her the total number of incidents. She agreed M.T. and I.T. did not accuse the Defendant of any wrongdoing.

B.T. testified that he met the Defendant through the mentoring program and that initially, he and the Defendant had fun. He said that something changed and that the Defendant began touching him where he did not want to be touched. He said that the first incident occurred in his bedroom but that he could not recall what occurred during the incident because of the passage of time between the incident and his testimony. He agreed he was age six at the time of the incident and that he was age eleven at the time of the trial.

B.T. testified that a second incident occurred at his home, that the Defendant inserted the Defendant's penis in B.T's "behind," and that "it hurt[]." B.T. said similar incidents occurred "a lot," but he could not recall the number of incidents. He said that at other times, the Defendant "tried to force [B.T.] to put it in [the Defendant's] mouth." B.T. said that at other times, the Defendant forced B.T. to touch the Defendant's penis. B.T. said that during some incidents, the Defendant's penis went "inside" his mouth and his "bottom." He denied that the Defendant touched him with the Defendant's hand and that B.T. touched the Defendant with B.T.'s hand. He said that the Defendant always told him not to tell his parents.

B.T. testified that he did not recall the last incident but that he recalled an incident during which M.T. walked in the room when the Defendant had the Defendant's mouth on B.T.'s penis. B.T. recalled that his pants were down but that the Defendant still wore his clothes. B.T. said that he did not speak to M.T. when she entered the room, that she left the

room, that they spoke later, and that he told her not to say anything unless someone asked. He said he was embarrassed and did not want people to know what occurred. He recalled seeing "spit" come from the Defendant's penis when the Defendant put the Defendant's penis in B.T.'s mouth.

B.T. testified that he told his mother what had occurred when he and his family were at Walmart and when his mother asked about a scratch on his chin. He said that the Defendant scratched him when the Defendant forced B.T. to put B.T.'s mouth on the Defendant's penis.

On cross-examination, B.T. testified that the Defendant spent a large amount of time with him and his family and that the Defendant never spanked him. He said the Defendant "popped" him on the ear if he attempted to move away from the Defendant when the Defendant touched him. B.T. agreed that his ear was never injured and that he never told his parents about it. He agreed that his bedroom had three beds and that he and the Defendant slept in different beds when the Defendant stayed overnight. B.T. agreed he did not explain to his mother why he did not want the Defendant to be his mentor anymore until he disclosed the touching at Walmart.

B.T. testified that he told the forensic interviewer that the scratch on his chin occurred from the Defendant's leading B.T. to the bedroom. He agreed he told the interviewer that the Defendant's inserting his penis in B.T.'s buttocks occurred numerous times and that the incidents occurred only during "the summer." He estimated more than ten incidents and denied previously stating less than ten incidents occurred. He said that some incidents occurred in his bedroom and others in the living room and that he did not recall previously stating the incidents only occurred in his bedroom.

B.T. testified that the first incident occurred in his bedroom, although he could not recall any details from the incident, that M.T. was inside the house with their cousin, and that he did not recall previously stating that he "screamed out" during the incident. Relative to the incident during which M.T. entered the room, B.T. said that the door was closed but unlocked and denied that the Defendant was in the kitchen. B.T. said that when M.T. entered the room, the Defendant acted as though he was tickling B.T. He agreed he told M.T. about the touching before telling his mother but denied telling his cousin.

On redirect examination, B.T. testified that he was scared of the Defendant and of the things the Defendant did to him. B.T. said that after the Defendant inserted the Defendant's penis into B.T.'s buttocks, he had difficulty using the bathroom for a while. He said it was difficult to remember details from the incidents because of the passage of time.

-4-

M.T. testified that she was age ten and was in the fifth grade at the time of the trial. She said that she had a mentor through the mentoring program and that the Defendant was B.T.'s mentor. She said that the Defendant cared for her and B.T. at times when their mother was not home. She recalled one day in which she and B.T. were home with the Defendant when their parents and younger sister were gone. M.T. said that she was doing her homework in the kitchen, that she wanted to show the Defendant her homework, that she walked to the living room, and that she saw the Defendant sitting on the couch and B.T. standing in front of the Defendant, and that B.T.'s pants and underwear were pulled down. M.T. said that the Defendant told her to return to the kitchen and that she complied. She said that she talked to B.T. about the incident later and that B.T. said he would tell their mother. M.T. said she and B.T. decided to tell their mother about the Defendant when they went to Walmart the next day. M.T. recalled that B.T. had a scratch under his eye at this time.

On cross-examination, M.T. testified relative to the incident she witnessed in the living room that the Defendant's pants were not pulled down and that the Defendant was fully dressed. She denied telling the defense investigator that B.T. ran into the living room from his bedroom while she was doing her homework and that the Defendant came from the same bedroom carrying a belt. She said that B.T. ran from the living room toward the bedroom with a belt and that B.T. was scratched while he was running.

On redirect examination, M.T. clarified that the Defendant grabbed B.T. and took B.T. to B.T.'s bedroom. She said that was the same time she walked into the living room. She said that when the Defendant took B.T. to the bedroom, B.T. had on his pants and that the Defendant was holding the Defendant's belt. She said that she attempted to open the bedroom door and that she heard what she thought were "whipping" sounds. She said the bedroom door was locked.

Judy Pinson, a nurse practitioner and an expert in sexual assault forensic examinations, testified that B.T. underwent a physical examination on October 14, 2012. She said B.T. reported that the Defendant had placed the Defendant's penis inside B.T.'s mouth and anus and had forced B.T. to place B.T.'s penis inside the Defendant's mouth. Ms. Pinson stated that the physical examination did not show injuries to the genital or anal areas but that B.T. had a scratch on his chin. Ms. Pinson said B.T. reported obtaining the scratch when the Defendant pulled him into his bedroom.

Ms. Pinson testified that sexual assaults against children seldom resulted in injuries, that many times the length of time between an incident and a child's reporting the incident prevented evidence of an injury, and that some types of sexual contact left no injuries. She said that the anus stretched, which decreased the likelihood penetration would cause injury. She stated that based upon the information in the report, an incident occurred three days before the examination and that it was possible any injury had healed because the anus

healed quickly. She could not determine whether an injury had occurred. She said that because three days had passed, a rape kit was not performed. She said that B.T. had showered and brushed his teeth during that time and presumably had used the bathroom.

On cross-examination, Ms. Pinson testified that the lack of an injury to B.T.'s anus was neither inconsistent with some form of sexual contact nor inconsistent with no sexual contact. She agreed that any lacerations or healing lacerations on the anus would have been noted in the report and that lacerations could result from a foreign object, hard or normal stool, or constipation. She said B.T. tested negative for sexually transmitted diseases. She said no evidence was collected in this case. She agreed B.T. reported oral and anal sex but noted he had no physical injuries to his mouth or anus. She said that after speaking with B.T., the physical examination, and the laboratory testing, no physical evidence "back[ed] up" an allegation of sexual assault but that the findings were expected. Ms. Pinson stated that if a child had suffered anal penetration, the child might experience constipation but that someone might suffer from constipation without having been sexually assaulted.

Teresa Onry, a forensic interviewer at the Child Advocacy Center, testified that she conducted B.T.'s forensic interview on October 16, 2012. She said that during the interview, B.T. made a disclosure of sexual contact and that at the point in the interview when B.T. began to disclose the sexual contact, B.T. began to fidget and became more soft spoken than he had been at the beginning of the interview. She said it was common for children B.T.'s age not to recall the details of an incident.

On cross-examination, Ms. Onry testified that she and B.T. were the only people in the room during the interview, although other personnel were permitted to observe from an adjacent room or by teleconference. She agreed law enforcement and Department of Children's Services case workers were allowed to request particular questions but that these people did not enter the room. She agreed that B.T.'s term for penis was "peter whacker" and that B.T. reported the Defendant's placing the Defendant's penis inside B.T.'s buttocks. She agreed that she asked him about the first incident and that B.T. could not recall the positions of his and the Defendant's bodies. She said B.T. stated that the first incident occurred when his sister was at majorette practice. She agreed that B.T. only reported the Defendant's inserting the Defendant's penis inside B.T's buttocks and that B.T. did not mention his or the Defendant's mouths.

Ms. Onry testified that B.T. also reported an incident during which M.T. entered the room and saw B.T.'s pants pulled down. Ms. Onry agreed that B.T. did not say the incident occurred in the living room or the kitchen and that B.T. said the incident occurred in B.T.'s bedroom. She said B.T. reported that the Defendant was in the kitchen when M.T. saw B.T. with his pants down.

-6-

Ms. Onry testified that she conducted M.T.'s forensic interview on October 18, 2012. She agreed that M.T. also reported seeing B.T. with his pants down and that M.T. reported being in the kitchen when this occurred. Ms. Onry said M.T. stated that she left the kitchen, that she walked to the living room, that she saw B.T.'s pants down, and that the Defendant was fully dressed. Ms. Onry agreed M.T. never reported seeing sexual contact. On redirect examination, Ms. Onry testified that B.T. appeared embarrassed and made less eye contact when he discussed the nature of the touching.

The video recording of B.T.'s forensic interview was played for the jury. In the recording, B.T. stated that he was age seven. He said that his mother did not want him to talk about "Chris" anymore because of what happened. B.T. said Chris was his mentor from the mentoring program. Although B.T. initially stated that Chris lived with him, he clarified that Chris stayed overnight periodically. B.T. said that when his family was at Walmart, his mother asked about a scratch on his chin and that the scratch occurred because Chris "pulled [him] into the room" by his chin. B.T. said that Chris always pulled him inside B.T.'s bedroom during these incidents and that the adults were away from home when this happened.

B.T. recalled one incident in which he and Chris were inside B.T.'s bedroom. He said that M.T. entered the bedroom and that B.T.'s clothes were off because Chris "was getting on me." B.T. said that Chris "tried to" place Chris's "peter wacker" inside B.T.'s "butt." B.T. identified peter wacker as his term for penis. B.T. said that during the first incident, his mother was not home. He said that he and Chris were watching "Everybody Hates Chris" on television in the living room, that Chris told him to go to his bedroom for "something," that Chris came into the room, and that Chris, without saying anything pulled down B.T.'s clothes. B.T. asked Chris what he was doing, but Chris did not respond. B.T. said that Chris's penis entered his anus but that he could not recall the positions of their bodies. B.T. said he was about six years old when the first incident occurred. B.T. said that Chris's pants were pulled down and that Chris wore a Mickey Mouse shirt and short pants. B.T. did not recall what clothes he wore that day. He did not feel or see anything come from Chris's penis. B.T. said that afterward, Chris stated that he would not be B.T.'s mentor anymore if B.T. told his mother what had occurred. B.T. said that afterward, he went to bed. B.T. said that the incident occurred in the afternoon while his sisters were at majorette practice. He could not recall the weather that day or the month in which the incident occurred.

B.T. stated that other similar incidents in which Chris placed his penis inside B.T.'s bottom occurred and that all the incidents occurred in B.T.'s bedroom. B.T. said that Chris did not place his penis anywhere else on B.T.'s body. Relative to the incident during which M.T. entered the bedroom, B.T. said that his clothes were off because Chris pulled them down, that Chris left the room and entered the kitchen, and that while Chris was in the kitchen, M.T. entered the bedroom. B.T. said that M.T. stated she understood what B.T. "had been telling" her. B.T. said that he told M.T. about the things Chris had been doing to

him a few days before B.T. told his mother about the incidents when the family was at Walmart and that M.T. wanted him to tell their mother. B.T. said that Chris did not see M.T. inside B.T.'s bedroom but that when Chris returned, Chris placed his penis inside B.T.'s bottom.

B.T. stated that when Chris grabbed him by his chin and pulled him into B.T.'s bedroom, Chris began putting his penis inside B.T.'s bottom. B.T. said that Chris also pushed B.T.'s head down and made B.T. place his mouth on Chris's penis. B.T. said that he attempted to resist, that he saw "spit" come from Chris's penis, and that the spit smelled like garbage. He said Chris went to the bathroom afterward. B.T. said that sometimes the Defendant attempted to make B.T. lick the spit but that B.T. did not lick it. He did not recall his and Chris's body positions. B.T. stated that during one incident, Chris said he would not "do it anymore" but that Chris continued doing it. B.T. did not notice anything unusual about Chris's penis.

Vincent Ores testified for the defense that he represented the Defendant at the preliminary hearing and that B.T. was the only witness at the hearing. Mr. Ores recalled that B.T. testified on cross-examination that the Defendant had placed the Defendant's penis inside B.T.'s anus less than ten times and that B.T. "screamed out" when the Defendant touched him. Mr. Ores also recalled that B.T. reported other people were inside the home when B.T. screamed. Mr. Ores recalled B.T. reported that the Defendant's penis did not enter B.T.'s mouth and that B.T.'s penis did not enter the Defendant's mouth.

On cross-examination, Mr. Ores testified that B.T. was age eight at the time of the hearing and that B.T. was calm and did not appear to be scared. Mr. Ores agreed that B.T. stated on direct examination that the Defendant pulled down B.T.'s clothes, that the Defendant placed the Defendant's penis inside B.T.'s buttocks, and that B.T. said he felt pain. Mr. Ores agreed B.T. stated that the Defendant placed the Defendant's penis inside B.T's mouth, that M.T. entered the room, that B.T.'s clothes were pulled down and the Defendant was fully dressed, and that the Defendant attempted to make it look as though the Defendant were tickling B.T. Mr. Ores agreed that B.T. testified that the Defendant thumped B.T. on the ear as a form of discipline.

The audio recording of the preliminary hearing was played for the jury. In the recording, B.T. testified that he was age eight and that he had known the Defendant for a long time. He could not recall whether the Defendant was his mentor but recalled the Defendant frequented B.T.'s home and stayed overnight a few times. B.T. said that the Defendant touched him more than once in an inappropriate manner. B.T. said the Defendant touched B.T.'s "private part" with the Defendant's hands and mouth. B.T. said that the Defendant pulled down B.T.'s pants when the Defendant touched B.T.'s private part with his hands and mouth. B.T. said that B.T.'s private part entered the Defendant's mouth. B.T.

said that the Defendant placed the Defendant's private part inside B.T.'s bottom and that it hurt. B.T. said that the Defendant attempted to place the Defendant's private part inside B.T.'s mouth but that the Defendant's private part did not enter B.T.'s mouth. B.T. said that at some point, the Defendant told B.T. that the Defendant would not do it again but that the Defendant continued doing it. B.T. said the incidents always occurred at B.T.'s home.

B.T. testified that during one incident, M.T. entered the room when B.T.'s pants were pulled down but that the Defendant's pants were not pulled down. B.T. said that the Defendant acted as though the Defendant was tickling B.T., that the Defendant told M.T. to leave the room, and that M.T. left. B.T. said that after M.T. left, the Defendant closed the door but that B.T. did not recall what occurred after the door was closed.

On cross-examination, B.T. testified that he liked the Defendant before the touching began and that they spent time together frequently. B.T. said that he and the Defendant slept in different beds inside B.T.'s bedroom. B.T. said that he did not know when the touching began but that the touching occurred on "a lot of days." B.T. said the incidents occurred inside B.T.'s bedroom but could not recall if adults were home. B.T. did not recall telling anyone about the touching. He identified his private part as a "wiener."

B.T. testified that he told the Defendant to stop touching him and that he could not recall the Defendant's response. B.T. denied telling his sisters about the touching. He said that the Defendant did not place the Defendant's private part inside B.T.'s mouth. B.T. did not know why he did not tell anyone about the touching. He denied the Defendant spanked him but said the Defendant "thumped" his ear. B.T. denied being naked in front of the Defendant. B.T. said that the Defendant placed the Defendant's penis inside B.T.'s bottom less than ten times. B.T. did not know whether he underwent a medical examination. B.T. said that he screamed during one incident, that other people were home, and that nobody came to investigate the scream.

Marsha Davis testified that she investigated this case for the defense and that she interviewed the victim's mother. Ms. Davis stated that the victim's mother said she called the Defendant after the family returned home from Walmart and asked the Defendant if he had touched B.T. Ms. Davis said the victim's mother reported that the Defendant denied any inappropriate touching.

Ms. Davis testified that she interviewed B.T. during her investigation and that B.T. denied the Defendant placed the Defendant's penis inside B.T.'s mouth. Ms. Davis said B.T. admitted telling M.T. and a cousin about the Defendant's touching B.T.

On cross-examination, Ms. Davis agreed B.T. reported that the Defendant had hurt B.T.'s buttocks with the Defendant's penis, that the Defendant had placed his mouth on

B.T.'s penis when they were alone inside a bedroom, and that these incidents occurred frequently when B.T.'s mother took B.T.'s sisters to majorette practice.

The Defendant testified that he was age twenty-four and that he had never been arrested before this case. He said that at the time of his arrest, he was attending college, working to pay for school, and attending church. He said that a police officer came to his place of employment and gave a business card to his manager. The Defendant said that he sent the officer an email because the speaker on his cell phone was broken but that he never received a response from the officer. The Defendant said that the officer returned to his place of employment and that the Defendant left a voicemail for the officer. The Defendant said he did not receive a response from the officer and was arrested the next day.

The Defendant testified that he met B.T. and his family through the mentoring program in September 2010. The Defendant said he took B.T. to a professional sporting event, taught B.T. "dance moves," assisted B.T. with homework, played games with B.T., and took B.T. to Chuck E. Cheese. The Defendant said that he also spent time with B.T.'s sisters and that he treated all of the children the same. The Defendant recalled that the week after he met B.T., the victim's mother called requesting the Defendant take B.T. to Chuck E. Cheese and that he and B.T. went to Chuck E. Cheese without B.T.'s parents.

The Defendant testified that he became close to B.T.'s family and that he stayed overnight at the family home multiple times. The Defendant said that B.T.'s bedroom contained three beds, that he slept in one bed, that B.T. slept in another bed, and that they never slept in the same bed. He said that when he was at the family home, the victim's parents, aunt, uncle, and cousins were usually also there. The Defendant said that he spanked B.T. once with the victim's mother's permission. The Defendant said that just as the victim's mother was getting ready to strike B.T. with a belt, B.T. requested the Defendant to spank him instead of the victim's mother. The Defendant said that the victim's mother gave him the belt and that he struck B.T.

The Defendant testified that he had never touched B.T. in a sexual manner and denied that he touched B.T.'s penis with the Defendant's hands or mouth. The Defendant denied having B.T. touch the Defendant's penis and having B.T. place his mouth on the Defendant's penis. The Defendant denied touching B.T.'s anus with the Defendant's penis or inserting the Defendant's penis inside B.T.'s anus. The Defendant also denied having sexual contact with B.T's sisters and cousins.

The Defendant testified that he did not sexually assault B.T. on October 12, 2012. The Defendant recalled that the children were home from school because of fall break, that on October 9 or 10, he received a telephone call from the victim's mother asking him to care for the children on October 11, and that he stayed overnight at the family home on October

10 and cared for the children on October 11. The Defendant said that the victim's mother left for work around 8:00 a.m., that he woke B.T., who had urinated in the bed overnight, that he sent B.T. to the bathroom to take a bath, that B.T.'s cousins woke and began watching television in the living room, and that B.T.'s sisters were playing in their bedroom. The Defendant said that he watched television with B.T's cousins while B.T. took a bath, that B.T. ran out of the bathroom naked with a nose bleed, that the Defendant tilted B.T.'s head back to stop the bleeding and cleaned B.T.'s face, and that B.T. returned to his bath. The Defendant said that after B.T.'s bath, B.T. began working on homework, that the victim's mother returned home around 3:00 p.m., and that the Defendant's grandmother picked up the Defendant around 3:30 p.m. The Defendant said that he next spoke to the victim's mother on October 14, when she called accusing him of touching B.T. inappropriately. The Defendant said that he denied the accusations and that the victim's mother threatened to hurt him if the accusations were true. He said he was initially shocked at the accusations but later felt frustrated and angry.

On cross-examination, the Defendant testified that he became close to the family and that he had a good relationship with B.T. as a mentor. He agreed he cared for the children when the victim's mother needed assistance and when she took B.T.'s sisters to majorette practice. He agreed he had attempted to contact the victim's mother since the allegations were made.

Upon this evidence, the Defendant was convicted of rape of a child and aggravated sexual battery. This appeal followed.

## I.      Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. Relative to the rape of the child conviction, he argues that the proof did not show the victim was anally penetrated by the Defendant as alleged in the election of the offense. Relative to the aggravated sexual battery conviction, he argues that the proof did not show that the victim's penis was in the Defendant's mouth when M.T. walked into the room as alleged in the election of the offense. The State responds that the evidence is sufficient but does not address the election of the offense issues.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility

-11-

of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522. Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2014).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] [t]he victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4). Sexual contact, in relevant part, is "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" *Id*. § 39-13-501(6) (2010) (amended 2013). Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id*. at (2).

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask [for] a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific

-12-

charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

[T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of offense,

[T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

Relative to rape of a child, the State made the following election of the offense: "The first time it occurred, when [B.T.'s] mother and sister were at majorette practice and [B.T.] and the defendant were watching TV, when [B.T.] went to his room the defendant came into

-13-

the room and told him to stand up and then pulled [B.T.'s] clothes down. The defendant put his penis in the hole of [B.T.'s] butt and it hurt."

The record reflects in the light most favorable to the State that B.T.'s date of birth was October 30, 2004, and that during the summer and the early fall of 2012, B.T. was age seven, although he testified he was age six at the time of the incidents. He testified at the trial that his relationship with the Defendant was fun initially but that the Defendant began touching him in places he did not want to be touched. B.T. said that that the first incident occurred inside his bedroom but that he could not recall what occurred because of the passage of time.

However, B.T. recalled the first incident with specificity during his forensic interview near the time he disclosed the sexual contact. B.T. stated that his mother was not home and that his sisters were at majorette practice. We note the victim's mother testified at the trial that majorette practice was on Mondays, Wednesdays, and Fridays during the summer of 2012 and that M.T. only participated for the first three weeks of practice before joining B.T.'s karate class. B.T. recalled during his forensic interview that he and the Defendant were watching "Everybody Hates Chris" on television in the living room, that the Defendant told him to go to his bedroom for "something," that the Defendant came into the room, and that the Defendant used the Defendant's hands to pull down B.T.'s clothes. B.T. stated that he asked the Defendant what he was doing but that the Defendant did not respond. B.T. said that the Defendant's penis entered B.T.'s anus but that he could not recall the positions of their bodies. B.T. said that the Defendant's pants were pulled down and that the Defendant wore a Mickey Mouse shirt and short pants. B.T. did not recall what clothes he wore that day and did not feel or see anything come from the Defendant's penis. B.T. said that afterward, the Defendant stated that he would not be B.T.'s mentor anymore if B.T. told his mother what had occurred. B.T. could not recall the weather that day or the month in which the incident occurred. At the preliminary hearing, B.T. testified generally that the Defendant's placing the Defendant's penis inside B.T.'s bottom hurt.

We conclude that the evidence is sufficient to support to the Defendant's conviction for rape of a child. Although B.T. could not recall the details of the first incident during his trial testimony, the forensic interview, admitted as substantive evidence, reflects that B.T. provided details about nature of the incident, the sequence of events, the type of sexual contact, and where his mother and sisters were at the time. The victim's mother testified that majorette practice was on Mondays, Wednesdays, and Fridays during the summer of 2012 and that M.T. only participated for the first three weeks of practice before joining B.T.'s karate class. We note that the credibility of the witnesses and any inconsistencies in the testimony were resolved by the jury, and the jury's verdict reflects it credited B.T.'s statements during the forensic interview. Likewise, the evidence regarding the first incident was sufficient to support the State's election of the offense. The Defendant is not entitled to relief on this basis.

Relative to aggravated sexual battery, the State made the following election of the offense: "The time that [M.T.] came into the room and saw [B.T.] with his pants off, when the defendant had put [B.T.'s] penis in his mouth."

In the light most favorable to the State, the record reflects that B.T. testified at the trial that he recalled an incident during which M.T. entered B.T.'s bedroom when the Defendant had the Defendant's mouth on B.T.'s penis. B.T. said that his pants were down but that the Defendant was fully dressed. B.T. said that M.T. did not speak when she entered, that the Defendant acted as though he were tickling B.T, and that M.T. left the room. B.T. said that the door was closed but unlocked. M.T. testified relative to this incident that she was in the kitchen, that she walked to the living room, and that she saw B.T.'s pants down and the Defendant fully dressed. Although the Defendant argues the evidence is insufficient because M.T. did not testify that she observed sexual contact between B.T. and the Defendant, B.T. testified regarding the Defendant's placing the Defendant's mouth on B.T.'s penis. B.T.'s testimony provided sufficient evidence to support the conviction. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (stating that a child victim's testimony regarding sexual contact can be sufficient to support a conviction). The conflicting testimony was before the jury, and its verdict reflects that it credited B.T.'s trial testimony. Likewise, the evidence regarding this incident was sufficient to support the State's election of the offense. The Defendant is not entitled to relief on this basis.

## II.    Cross-Examination

The Defendant contends that the trial court erred by limiting his cross-examination of M.T. and Ms. Onry. The Defendant argues that questioning M.T. and Ms. Onry regarding an incident at school during which a boy touched M.T.'s bottom was relevant to showing the reason B.T. and M.T. made false allegations against the Defendant. The State responds that the evidence is irrelevant and was properly excluded.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence generally lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

"[C]ross-examination is a fundamental right." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "[A] denial of the right to an effective cross-examination is 'constitutional error of the first magnitude and amounts to a violation of the basic right to a fair trial.'" *Id.* (quoting *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980)). "The

propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court." *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012).

The record reflects that during M.T.'s cross-examination, defense counsel asked whether the Defendant had touched her and that M.T. denied he had. Counsel asked, "But, somebody's touched you before where they weren't supposed to; right?" M.T. denied a boy from her school had touched her. A bench conference was held, during which the prosecutor objected on the basis of relevance. Counsel argued that evidence of whether M.T. had been previously touched inappropriately was relevant because the boy who allegedly touched M.T. was "sent away" and because M.T. might have told B.T. about the incident to "get [the Defendant] away." The court stated that no testimony was elicited from B.T. about whether M.T. said anything to him about how to "cause [the Defendant] to be taken away" and determined the testimony was irrelevant to the present case. The court determined that insufficient evidence had been presented during B.T.'s testimony to show he knew anything about the incident involving M.T. and that any connection between the incident and this case was speculative.

Counsel was permitted to make an offer of proof during a jury-out hearing. During the hearing, M.T. testified that she did not recall a boy named "Rodriquez" at her school or telling Ms. Onry during her forensic interview that Rodriquez had touched M.T.'s bottom and was sent home from school.

The prosecutor stated that it was routine practice to ask a child during a forensic interview if the child had ever been touched inappropriately and that the incident involving M.T. and Rodriquez was irrelevant. The trial court agreed and determined the evidence was irrelevant and inadmissible. The court found that no evidence showed that a connection existed between the incident at M.T.'s school and B.T.'s allegations against the Defendant, that M.T. told B.T. about the incident at the school, that B.T. was aware of the incident at the school, and that a plot existed between B.T. and M.T. to "get rid of" the Defendant. The court also determined that if counsel wanted to play the recording of M.T.'s forensic interview for impeachment purposes, the portion related to this incident must be redacted because it was irrelevant. Counsel declined to play the recording but continued his offer of proof after Ms. Onry's trial testimony.

In a jury-out hearing, Ms. Onry testified that M.T. stated during the forensic interview that the Defendant had never touched her but that Rodriquez, a boy at her school, touched her on her bottom with his hand. Ms. Onry agreed that Rodriquez "went home" after the incident.

We conclude that the trial court did not abuse its discretion by excluding evidence of the incident at the school involving M.T. and Rodriquez. No evidence was presented at the

trial that B.T. knew about the incident or about Rodriquez's being sent home from school as a result of his conduct. Likewise, no evidence shows that M.T. and B.T. were conspiring to have the Defendant removed from being B.T.'s mentor. Without evidence that B.T. knew about the incident, any conclusions that B.T. and M.T. had fabricated the allegations against the Defendant would have been speculative. We note that although the Defendant argues in his brief that his theory of the case was that B.T. and M.T. made false allegations against him, the defense did not question B.T. about the incident involving M.T. and Rodriquez during cross-examination. As a result, evidence regarding the incident involving M.T. and Rodriquez does not make it more or less probable that B.T. fabricated the allegations against the Defendant. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE